UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                                               :

FOREST L. FATE, SR.,                         :

                         Plaintiff,     :

                                          :              11 Civ. 6838 (JPO)

            -v-                   :

                                          :             OPINION AND ORDER

RONNIE CHARLES, CHRISTOPHER KORBA, :
KHALID PARWANTA, THE VILLAGE OF   :
SPRING VALLEY, and "JOHN DOE," fictitious :
name intended to represent the name of one or  :
more Village of Spring Valley officers, whose  :
identities are unknown,                 :

                        Defendants. :
--------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      Plaintiff Forest L. Fate, Sr. ("Fate") brings this action under 42 U.S.C. § 1983 against the

Village of Spring Valley, New York (the "Village") and Officers Ronnie Charles ("Charles"),

Christopher Korba ("Korba"), and Khalid Parwanta ("Parwanta") for alleged constitutional

violations arising out of an arrest and search on October 31, 2009.  Fate asserts Fourth

Amendment claims for unreasonable search, illegal seizure of currency, malicious prosecution,

and excessive force.  Defendants move for summary judgment on all but the excessive force

claim.  For the reasons that follow, Defendants' motion is granted in part and denied in part.

Fate's malicious prosecution claims are dismissed, but his remaining claims survive summary

judgment.

## I.      Background

###      A.     Factual Background

      Because Defendants move for summary judgment, the following section summarizes the

evidence in the light most favorable to Fate.

1.        **The Stop and Arrest**

On the morning of October 31, 2009, Fate was walking to a deli to pick up breakfast for himself and his wife when he noticed a police SUV drive by.  Fate had been living in North Carolina and had recently returned to Spring Valley in order to bail his son, Forest Fate, Jr., out of jail.  As he reached the store, the SUV circled around and pulled up beside him.  Inside were Officers Charles and Korba.

Charles rolled down his window and asked Fate whether he knew him.  He did.  Charles grew up in the same area as Fate, and, according to Fate, had a "personal problem with [him] because he assumed that [Fate] or [Fate Jr.] was dating or messing with his baby's mother." (Dkt. No. 73 ("Holtzer Decl."), Ex. E ("Fate Tr.") 21:24-22:3.)  Charles "would always harass [Fate]" and had done so "about three times" in his capacity as an officer, for instance by randomly stopping Fate and patting him down.  (*Id.* 25:16, 26:20-24, 27:2-4.)  Fate claims that in 2006, Charles tackled him from behind and arrested him (mistaking Fate for Fate Jr.), and took money from Fate and did not give it back.  (*Id.* 42:6-11.)  Fate's allegations are corroborated, to an extent, by Charles and Korba.  Korba testified that he knew that Charles had run-ins with Fate before.  (Holtzer Decl., Ex. F ("Korba Tr.") 27:14-28:7.)  And Charles testified that he had dealt with Fate prior to the October 2009 incident and he was "very well-known to me."  (Holtzer Decl., Ex. G ("Charles Tr.") 86:5-9.)

Fate, therefore, recognized Charles's face.  But because he could not recall his name, he responded: "No, not that I know of."  (Fate Tr. 56:5-17.)  Charles asked Fate if his name was Forest, and he said yes.  Charles asked "Forest what?" and Fate replied: "I was raised by the Bullock family, so you might think that you know me from the Bullock family because that's who I was raised by."  (*Id.* 56:19-22.)  Charles then expressly asked for Fate's last name, and Fate responded: "Well, some call me Forest Bullock, some call me Forest Gump or whatever."

(*Id.* 57:9-15.)  Charles told Fate: "If I jump out of this truck, if I found out your name is something other than Forest Bullock or Forest whatever you call it . . . I'm going to lock your ass up for false impersonation."  (*Id.* 58:3-8.)  Fate still did not reveal his last name, but offered to let Charles see his ID.  Charles got out of the vehicle, told Fate to get against the wall, and performed a pat down search.  When the officers ran Fate's ID, they discovered a warrant for petit larceny in Clarkstown, New York and placed him under arrest.

The trip to the station lasted approximately five to seven minutes.  Fate was handcuffed behind his back and fidgeted due to discomfort.  Korba was sitting next to Fate in the back seat. Neither he nor Charles made any remarks about Fate's movements.  When they arrived at the station, Korba quickly jumped out and pulled Fate out of the vehicle, believing that he had been trying to conceal something in his buttocks during the trip.  (Korba Tr. 27:14-28:7.)  Fate denies that he was trying to conceal anything or that he had any contraband on him.  (Fate Tr. 67:10-21.)

> ### 2.     The Strip Search

Korba and Charles took Fate to the holding room, removed his handcuffs, and instructed him to take off his clothes.  Fate complied and Korba searched his clothing.  Korba claims that crack cocaine fell out of Fate's socks.  (Korba Tr. 31:10-15; *see also* Charles Tr. 108:24-109:6 (noting that Korba said "something in reference to cocaine" when the crack fell out).)  Fate denies this.  (Fate Tr. 68:18-22.)  Fate was then instructed to get up against the wall to be searched.  (*Id.* 69:5-13.)  Korba asked Fate to bend over and spread his buttocks so he could see if Fate was concealing anything.  Fate did, and Korba claims that he saw a piece of plastic sticking out from between Fate's buttocks.  (Korba Tr. 33:15-21.)  Fate denies this as well.  (Fate Tr. 80:3-10.)  Fate was then "pushed in a way," "turned to turn around," and they "got to tousling" and Fate "was thrown to the ground."  (*Id.* 69:5-18, 73:15-20.)

Three or four officers were now present in the holding cell.  As Fate was on the ground, one officer had his right hand, another had his left hand, and Charles was behind him yelling "Give me your hands."  (*Id.* 69:23-70:14.)  Fate could not give him his hands, however, because they were restrained by the other officers.  Fate admits that he was "struggling with them" because things were "happening so fast" and he was trying to get people off of him.  (*Id.* 74:6-16.)  Korba claims that during the struggle another baggy of cocaine "fell to the ground," and while Fate was on the ground he grabbed it—apparently somehow while his hands were still restrained—and shoved it into his mouth.[1]  (Korba Tr. 35:10-14.)  Fate denies this.  (Fate Tr. 83:4-18.)  Korba tased Fate three or four times, until one of the officers said "He can't give you [his] hands . . . because I got them."[2]  (*Id.* 74:17-24.)  Fate was then told he could get dressed and was taken to the hospital due, at least in part, to an asthma attack.  Korba prepared an incident report later that day which charged Fate with false personation, criminal possession of a controlled substance in the fifth degree, tampering with physical evidence, and obstruction of governmental administration in the second degree (the "Spring Valley charges").  (Holtzer Decl., Ex. N.)

As part of the property confiscated from Fate, the officers logged $268.76 into evidence.  (Holtzer Decl., Ex. Q ("Jail Log").)  Fate claims, however, that he had been carrying

---

[1] It is unclear whether this is the baggy that allegedly was between Fate's buttocks.  Defendants contend that there were three baggies of cocaine in total.

[2] Fate is unclear about whether Charles or Korba applied the taser.  (*Compare* Fate Tr. 72:14–76:14 (suggesting Charles tased him); Dkt. No. 76 ("Pl.'s 56.1") ¶ 61 (stating that the tasing stopped when Charles was told that Fate could not give him his hands), *with* Pl.'s 56.1 ¶ 59 (implicitly admitting that Korba tased him).)  Korba testified that he was the officer who tased Fate, which is consistent with the incident report.  (Korba Tr. 42:22-24; Holtzer Decl., Ex. N.)  The Court therefore assumes for purposes of this motion that Korba was the officer who tased Fate.

approximately $2,700, which he had collected from friends and family members, including his wife, for the purpose of bailing out his son.  The $268.76 was eventually returned to Fate.

### B.        Procedural Background

Fate filed a *pro se* complaint against the Village and Officers Charles and Korba on September 27, 2011.  (Dkt. No. 1.)  The Court granted Fate's request for appointment of pro bono counsel on June 22, 2012.  (Dkt. No. 21.)  On January 4, 2013, Fate, through counsel, filed an amended complaint adding Officer Parwanta as a defendant and asserting § 1983 claims for violation of his rights under the First, Fourth, and Fourteenth Amendments.  (Dkt. No. 40 ("Am. Compl.").)  Defendants answered on January 18.  (Dkt. No. 42.)  Fate withdrew his First Amendment claims via letter dated April 19 and his *Monell* claims at a conference on May 15, 2013.  (Dkt. Nos. 51 & 57.)  Defendants filed the instant motion on September 20, 2013, seeking summary judgment on all but the excessive force claims.  (Dkt. No. 72.)

## II.     Legal Standard on Summary Judgment

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is material if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

On a motion for summary judgment, the party bearing the burden of proof at trial must come forward with evidence on each element of its claim or defense illustrating its entitlement to relief.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  It cannot rely upon mere "conclusory statements, conjecture, or speculation" to meet its burden.  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citations omitted).  If the party with the burden of proof

makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence. Fed. R. Civ. P. 56(f); *Anderson*, 447 U.S. at 250-51. The court should view all evidence "in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor," and a motion for summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citations and quotations omitted).

Generally, "[i]ssues that depend on the credibility of witnesses . . . are to be decided by the jury." *Gunning v. Cooley*, 281 U.S. 90, 94 (1930). Consequently, when the material evidence essentially consists of contradictory testimony, summary judgment will not be appropriate. Only "in the rare circumstances" when there is "nothing in the record to support [the] plaintiff's allegations other than [his] own contradictory and incomplete testimony," and "even after drawing all inferences in the light most favorable to the plaintiff . . . no reasonable person could believe [his] testimony," will summary judgment be warranted. *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) (citations and quotations omitted).

## III.   Discussion

### A.   Malicious Prosecution

To prevail on his malicious prosecution claims, Fate must establish "(1) the initiation or continuation of a criminal proceeding against [him]; (2) termination of the proceeding in [his] favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for [Defendants'] actions." *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995). Defendants contend that Fate cannot establish any of these elements besides the initiation of a criminal proceeding against him.

With respect to the second element—termination in favor of the accused—Fate must present evidence that there was a determination in his favor "on the merits," or that "the failure to proceed 'implies a lack of reasonable grounds for the prosecution.'"  *Russo v. New York*, 672 F.2d 1014, 1019 (2d Cir. 1982) (citation and quotations omitted).  The only evidence he has provided, however, is a discrepancy between the Certificate of Disposition for the Spring Valley charges, which states "Dismissed," and the Certificate of Disposition for charges out of Spring Valley from 2006, which states "Dsm/CovrdByOtherPlea."[3]  (*Compare* Dkt. No. 77 ("Parker Decl."), Ex. 1 ("Disposition Cert."), *with id.* Ex. 2.)  Even when viewed in the light most favorable to Fate, this variation merely reflects that the 2009 Spring Valley charges were dismissed; it does not provide any reasonable basis for concluding that "the dismissal was one which [wa]s 'favorable' to him."  *Russo*, 672 F.2d at 1019.

---

[3] The parties dispute at length whether Fate's guilty plea to charges under indictments arising out of the sale of drugs in 2010 and a burglary in 2005 "covered" the Spring Valley charges.  Under New York law, "a guilty plea is not a termination in favor of the accused for purposes of a malicious prosecution claim," *Rivera v. City of Yonkers*, 470 F. Supp. 2d 402, 408 (S.D.N.Y. 2007) (citing *Posr v. Court Officer Shield #207*, 180 F.3d 409, 418 (2d Cir. 1999)), and if a charge is "covered" under a separate indictment, a guilty plea as to that indictment is tantamount to a guilty plea as to the charging indictment, *see, e.g.*, *People v. Caban*, 246 A.D.2d 438, 439 (1st Dep't 1998).  It seems clear that Fate pleaded guilty to the possession charge as part of his guilty plea to Indictments 496-2010 and 284-2010 in 2011.  (Holtzer Decl., Ex. M ("June 2011 Tr.") at 3-4 ("[U]nder the plea to 284-10 it was to cover criminal possession controlled substance seventh.").)  That Fate was sentenced on June 14, 2011 and his Certification of Disposition is dated shortly afterwards on July 12, 2011 dispels any doubt.  (*See* Dkt. No. 77, Ex. 1; June 2011 Tr.)  It is less clear whether Fate's plea and sentence covered the other three Spring Valley charges.  The plea transcript suggests that they did not.  Although the court noted at the outset that the prosecutor agreed to cover "any" outstanding misdemeanor charges, when the prosecutor was asked what those charges were, he represented that there was only the possession charge. (Holtzer Decl., Ex. L at 3.)  Moreover, throughout the proceedings, the court and prosecutor referenced only this charge, so there was no reason for Fate to believe that he was pleading guilty to the other Spring Valley charges.  In any event, because Fate has failed to provide evidence that any of the charges were disposed of *in his favor*—rather than simply not covered by his guilty plea—he cannot prevail on his claims for malicious prosecution.

This case is directly controlled by *Russo*, where the Second Circuit ordered a new trial after a jury returned a verdict for the plaintiff on his malicious prosecution claim because the plaintiff had presented "no reason for the dismissal of the . . . charge."[4] *Id.* at 1020-22. Fate's failure to adduce any reason for why the Spring Valley charges were dismissed similarly constitutes "insufficient proof as a matter of law that the proceedings were terminated in [his] favor." *Id.* at 1020; *see also Hayes v. Schultz*, 541 N.Y.S.2d 115 (2d Dep't 1989) ("The certificate of disposition of the criminal charges brought against [the plaintiff] merely noted that the charge was dismissed. This leaves the question of the plaintiff's guilt or innocence unanswered. The plaintiff's cause of action to recover damages for malicious prosecution should therefore have been dismissed."). Accordingly, Fate's malicious prosecution claims must be dismissed.

**B.      Illegal Seizure of Currency**

Defendants also seek summary judgment on Fate's illegal seizure claim for lack of evidence. They note that neither Korba nor Charles recalls Fate's having more than a few hundred dollars on him, and the Jail Log, which Fate signed, indicates that only $286.76 was confiscated. (Korba Tr. 74:5-7; Charles Tr. 123:3-12; Jail Log.) Defendants also point to a letter from Fate's criminal attorney requesting the release of "the two hundred and fifty (250) dollars that was taken . . . on October 31, 2009." (Holtzer Decl., Ex. P.) Fate argues that his attorney was simply asking for the amount that had been entered into evidence. (Fate Tr. 98:10-20.) He

---

[4] Fate argues that Defendants' motion for summary judgment should be denied based upon *Askins v. City of N.Y.*, 2012 U.S. Dist. LEXIS 19940, at *23 (S.D.N.Y. Feb. 13, 2012) ("The record is silent on why the charges were dismissed, and it is Defendants' burden on summary judgment to show that the termination was not, in fact, favorable."), *rev'd in part on other grounds*, 727 F.3d 249 (2d Cir. 2013). In *Askins*, the court dismissed the plaintiff's claims on other grounds. *Id.* To the extent that *Askins* stands for the proposition that the defendants, rather than the plaintiff, bear the burden of proof on a motion for summary judgment of the plaintiff's malicious prosecution claim, this Court must disagree in light of *Russo* and *Celotex*.

also cites testimony from his wife, Samantha Fate, indicating that she "learn[ed]" that Fate "had about $1,000" on him as "bail money for his son," and that she personally contributed to that amount and knew other family members had as well.  (Parker Decl., Ex. 6 ("S. Fate Tr.") 55:16-56:19.)

Fate does not provide any explanation for why he signed the Jail Log.  Moreover, his wife's testimony is contradictory.  At one point she said that "he had $300.00 in his pocket," which is consistent with the Jail Log.  (S. Fate Tr. 54:20-22.)  At another, she stated that she "learned" he had "about $1,000 on him."  (*Id.* 55:16-56:2.)  Even if this is not inadmissible hearsay, it is a far cry from Fate's claim that he had nearly $3,000 on him.  Nevertheless, Fate has consistently testified that he had approximately $2,700 on him, and his wife's testimony plausibly supports his claim that *some* amount of money was wrongfully taken from him and never returned.  Because this issue comes down to credibility, Defendants' motion for summary judgment as to the illegal seizure claim is denied.

### C.      Unreasonable Strip Search

Defendants seek summary judgment on Fate's unreasonable strip search claim on the grounds that there was no constitutional violation, and even if there was, they are entitled to qualified immunity.

#### 1.      Constitutional Violation

The question here is whether a police officer may force a man to hold his buttocks open and expose his anus—without any reason to suspect that he is hiding something there—when he is booked for a misdemeanor offense.  Such searches were unconstitutional in this Circuit for more than twenty-five years.  *See Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (citing *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986)); *see also N.G. v. Connecticut*, 382 F.3d 225, 232 (2d Cir. 2004) (collecting cases establishing the same rule in the First, Fourth, Fifth, Sixth,

Seventh, Eighth, Ninth, and Tenth Circuits, many of which were unquestioned before 2012)). Defendants argue that a recent Supreme Court decision, *Florence v. Board of Chosen Freeholders*, 132 S. Ct. 1510 (2012), abrogated that longstanding rule. Their motion requires the Court to determine whether *Florence* permits suspicionless strip searches of misdemeanor arrestees in a police station.

As a preliminary matter, it is essential to distinguish among types of searches that may be denoted by the umbrella term "strip search." One type of search requires that the subject remove all of his clothing and permit officers to inspect him while he stands, naked, in their presence. This is a "strip search." Another, more invasive type of search requires the subject to hold his buttocks open to allow officers to visually inspect his anus. Likewise, a female subject may be required to squat or hold her labia open to allow officers to visually inspect her vagina. The Court refers to this search—the type of search at issue in this case—as a "visual body cavity search." Finally, the most invasive type of search, which crosses from a visual to a manual inspection of the subject's body cavity, is a "manual body cavity search." This type of search is not at issue here.

### a.      Arrestee Strip Searches Before *Florence*

The Fourth Amendment prohibits the government from conducting unreasonable searches. A search without prior judicial approval in the form of a warrant is presumptively unreasonable. *Katz v. United States*, 389 U.S. 347, 357 (1967). Such searches are constitutional only if they fall within an exception to the warrant requirement. *Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013); *Katz*, 389 U.S. at 357 ("[S]earches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.").

Warrantless strip searches of arrestees in police stations are commonly justified as searches incident to a lawful arrest.[5]  When a police officer arrests a person based on probable cause, he may conduct a "full search of the person" of the arrestee.  *United States v. Robinson*, 414 U.S. 218, 235 (1973).  It is reasonable for an arresting officer to search the arrestee in order to disarm him and preserve evidence for use at trial.  *Knowles v. Iowa*, 525 U.S. 113, 116 (1998) (citing *Robinson*, 414 U.S. at 234); *see also Maryland v. King*, 133 S. Ct. 1958, 1982 (2013) (Scalia, J., dissenting) ("The objects of a search incident to arrest must be either (1) weapons or evidence that might easily be destroyed, or (2) evidence relevant to the crime of arrest." (citations omitted)).  This authority extends to searches that take place upon the arrestee's arrival at a police station.  *United States v. Edwards*, 415 U.S. 800, 802-03 (1974).

But officers are not permitted to search arrestees in any manner they please.  All searches must be reasonable in "scope and manner of execution."  *King*, 133 S. Ct. at 1970 (citing *Illinois v. McArthur*, 531 U.S. 326, 331 (2001)).  An exception to the warrant requirement is not carte blanche; it merely changes the applicable standard from a rule of per se unreasonableness to a test balancing privacy interests against law enforcement interests.  *Id.* (citing *McArthur*, 531 U.S. at 331; *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)); *cf. Coolidge v. New Hampshire*, 403 U.S. 443, 461 (1971) (in the context of the automobile exception: "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears.")).  Even the

---

[5] These searches are also occasionally justified as inventory searches.  3 Wayne R. LaFave, Search and Seizure § 5.3(a) (5th ed. 2012) ("The second theoretical justification for a search of an arrestee's person upon his arrival at the place of detention is that of inventory incident to the defendant's booking into jail. . . . [T]he booking inventory . . . may even extend to a strip search.") (citing *United States v. Tillery*, 332 F. Supp. 217 (E.D. Pa. 1971); *People v. Brooks*, 274 N.W.2d 430 (Mich. 1979)).  But the leading Second Circuit case on point characterizes stationhouse strip searches as searches incident to a lawful arrest, *Hartline*, 546 F.3d at 101, and Defendants do not argue that these searches are justifiable as inventory searches.  The Court therefore declines to consider this argument.

leading cases defining the scope of searches incident to lawful arrest have been careful to specify that they do not condone searches with "extreme or patently abusive characteristics," *Robinson*, 414 U.S. at 236, or, put another way, searches that "violate the dictates of reason either because of their number or their manner of perpetration," *Edwards*, 415 U.S. at 808 n.9.

The privacy interest in one's naked body, and one's body cavities, is especially high.[6]  A search requiring exposure of these areas is undoubtedly extreme.  To justify interference with this privacy interest as "reasonable," the Second Circuit requires a correspondingly high law enforcement interest in disarming the arrestee or preserving evidence for use at trial.  An ordinary misdemeanor arrest is not sufficient for these purposes.  Instead, to justify strip searching a misdemeanor arrestee at a police station, an officer must have reason to suspect that the specific arrestee is concealing weapons or other contraband.  *Hartline*, 546 F.3d at 100 (citing *Weber*, 804 F.2d at 802).  This individualized "reasonable suspicion" is the same level of suspicion first defined in *Terry v. Ohio*, 392 U.S. 1, 21 (1968): the suspicion need not rise to the level of probable cause, but it must be "more substantial than [an] inarticulate hunch[]."  *Id.* at 22; *see Hartline*, 546 F.3d at 100 (citing *Varrone v. Bilotti*, 123 F.3d 75, 79 (1997) (in turn citing

---

[6] This proposition does not really call for justification, but a considerable body of authority supports the point.  *See, e.g., Gonzalez v. City of Schenectady*, 728 F.3d 149, 165 (2d Cir. 2013) (Pooler, J., dissenting) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 672 (1995) (characterizing visual body cavity searches as the "most intrusive" of searches)); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (describing visual body cavity searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission") (citation omitted)); *see also, e.g., Florence*, 132 S. Ct. at 1526–27 (Breyer, J., dissenting) ("A strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy. . . .  Even when carried out in a respectful manner, and even absent any physical touching, [] such searches are inherently harmful, humiliating, and degrading.  And the harm to privacy interests would seem particularly acute where the person searched may well have no expectation of being subject to such a search [] because she had simply [committed a minor offense]. . . . I need not go on.  I doubt that we seriously disagree about the nature of the strip search or about the serious affront to human dignity and to individual privacy that it presents.").

*Wood v. Clemons*, 89 F.3d 922, 929 (1st Cir. 1996), which, in turn, cited *Terry* to define the

reasonable suspicion standard)).  The officer must be able to justify the particular intrusion he

makes—in other words, the fact that he chooses to conduct a strip or visual/manual body cavity

search—based on "specific and articulable facts which, taken together with rational inferences

from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; *see Hartline*, 546

F.3d at 100.

### b.   Scope of *Florence*

The Supreme Court in *Florence* analyzed a detainee's strip search claims using a very

different framework.  The starting point in *Florence* was the principle that "[m]aintaining safety

and order at [a detention center] requires the expertise of correctional officials, who must have

substantial discretion to devise reasonable solutions to the problems they face."  132 S. Ct. at

1515.  In light of that concern, the Court reiterated the rule that "a regulation impinging on an

inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological

interests.'"  *Id.* (quoting *Turner v. Safely*, 482 U.S. 78, 89 (1987)).  Here it becomes essential to

distinguish two different exceptions to the warrant requirement.  The holding in *Florence* does

not justify warrantless strip searches as incident to a lawful arrest.  Instead, *Florence* justifies

warrantless strip searches as required by a reasonable policy for maintaining order in the general

population of a jail.  This justification is a different exception to the warrant requirement, which

the Second Circuit has characterized as a type of "special needs" search.[7]  *Hartline*, 546 F.3d at

102 n.5 (noting that a stationhouse strip search "presents a markedly different set of

---

[7] "Special needs" are needs other than law enforcement.  *N.G.*, 382 F.3d at 230 (citing *Bd. of Educ. v. Earls*, 536 U.S. 822 (2002)).  In contrast, law enforcement is one purpose of searches incident to a lawful arrest, which are partially justified by the reasonableness of preserving evidence that may be used at trial.

circumstances than those addressed by the 'special needs' standard applied to policies providing

for routine strip searches in penal and other institutions housing large, dangerous, or vulnerable

populations where introduction of secreted contraband from the outside raises a substantial risk

of harm") (citing *N.G.*, 382 F.3d at 234-37).  Because the Supreme Court recently suggested that

"special needs" may be a misnomer in this context,[8] this opinion refers to such searches as

"detainee safety" searches.

     While *Florence* does not explicitly state the exception to the warrant requirement upon

which it relies, the Court's analysis is entirely dependent on the holdings in *Bell v. Wolfish*, 441

U.S. 520 (1979), and *Turner v. Safely*, 482 U.S. 78 (1987), leading cases establishing the concept

of a detainee safety search.  *Bell* upheld a jail's policy of conducting visual body cavity searches

of pretrial detainees following a contact visit with someone from outside the jail.  441 U.S. at

558-60.  Declining to apply the warrant requirement,[9] the *Bell* Court applied a reasonableness

---

[8] The Supreme Court recently held that the "special needs" rationale does not apply to cases concerning detainee searches that involve a minor intrusion such as a cheek swab: "an individual [who] has been arrested on probable cause for a dangerous offense that may require detention before trial" has a reduced expectation of privacy, and therefore, "DNA identification like that at issue here thus does not require consideration of any unique needs that would be required to justify searching the average citizen."  *King*, 133 S. Ct. at 1978.  This leaves open the possibility that searches of people arrested for non-dangerous crimes, or searches more intrusive than a cheek swab, are appropriately analyzed as special needs searches.  *Cf. Florence v. Board of Chosen Freeholders*, 621 F.3d 296, 308 n.8 (3d Cir. 2010) ("The absence of an individualized suspicion requirement in *Bell* is consistent with the Fourth Amendment doctrine of special needs searches."); *N.G.*, 382 F.3d at 231 (describing *Bell* and other cases permitting regulatory searches in detention centers as special needs cases).

[9] *Bell* entailed a challenge to many jail policies, including both the visual body cavity search policy and a policy of conducting random, unannounced searches of detainees' living areas.  441 U.S. at 555-560.  With regard to the latter policy, the Court observed that "even the most zealous advocate of prisoners' rights would not suggest that a warrant is required to conduct such a search."  *Id.* at 557.  This is *Bell*'s only explicit reference to the warrant requirement.  The discussion of suspicionless visual body cavity searches, on the other hand, strongly suggests (but does not explicitly state) that a reasonableness standard applies in light of the jail's institutional needs.  *Id.* at 558 (ruling on the visual body cavity searches: "The Fourth Amendment prohibits only unreasonable searches, and under the circumstances, we do not believe that these searches are unreasonable." (citation omitted)).

test to the visual body cavity search policy, holding that there must be "mutual accommodation" between legitimate institutional needs and the Fourth Amendment, a "principle [which] applies equally to pretrial detainees and convicted prisoners." *Id.* at 546. *Bell* emphasized that "[p]rison administrators [] should be accorded wide-ranging deference in the adoption and execution of policies . . . needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547. Later, in *Turner*, the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."[10]  482 U.S. at 89.

These cases permit corrections officials to establish reasonable policies for routine suspicionless searches to handle the "laborious administration of prisons," a responsibility which *Florence* discusses at length. 132 S.Ct. at 1521. Jail officials are allowed to search a detainee pursuant to a general policy, rather than a reason specific to that detainee, because of "the difficulties of operating a detention center"; specifically, maintaining safety, order, and hygiene among a sizeable, constantly changing, and potentially dangerous group of detainees housed together in the general population. *Florence*, 132 S. Ct. at 1515-18 (citing, *inter alia*, *Bell*, 441 U.S. 520). The legitimate ends of a detainee safety search are therefore broader than a search incident to a lawful arrest, which is limited to a search for weapons and evidence to use against the arrestee at trial. But jail officials may also search detainees for "lice or other contagious infections," "wounds or other injuries," "tattoos or other signs of gang affiliation," "scarce items . . . that have value in a jail's culture," and anything else that may "creat[e] unnecessary risk for

---

[10] Although the *Turner* standard refers to "penological interests," the Supreme Court has applied the standard to pretrial detainees as well. The standard was first articulated as a direct result of *Bell*, a case about the rights of pretrial detainees. *Florence*, which is also a case about the rights of pretrial detainees, relies heavily on the *Turner* standard, once restyling "penological interests" as "security interests." 132 S. Ct. at 1517, 1528.

the entire jail population": the idea is to maintain safety, order, and hygiene among the general population of detainees. *Id.* at 1518-19, 1522.

There is another important distinction between a search incident to a lawful arrest and a search pursuant to a jail regulation: the burden of proof is different. *Florence* applied the *Turner* standard (and holdings in subsequent cases) to raise the burden on pretrial detainees challenging a suspicionless search policy. Heeding *Bell*'s warning that courts should "ordinarily defer to [the] expert judgment" of policymakers, *Florence* held that a pretrial detainee is required to produce "substantial evidence" that a jail's suspicionless search policy is unreasonable in order to succeed on a Fourth Amendment claim. *Florence*, 132 S. Ct. at 1517; *see Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (discussing convicted prisoners' claims: "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."). This standard is even more forgiving of suspicionless searches than the "free-form 'reasonableness' inquiry" that applies to searches incident to a lawful arrest. *Cf. King*, 133 S. Ct. at 1981-82 (Scalia, J., dissenting). But such extraordinary deference to corrections officials depends entirely upon a weighty government interest: the unique challenge of maintaining order in a "crowded, unsanitary, and dangerous" jail. *Florence*, 132 S. Ct. at 1521.

These two distinctions—the justification for the search and the relevant burden of proof—separate searches incident to a lawful arrest from detainee safety searches. Both distinctions preclude *Florence*'s application to a discretionary strip search in a police station. A police station is not a jail. In the absence of a large, potentially dangerous, and ever-changing population of detainees, there is a less compelling law enforcement interest to balance against the extreme intrusion of a strip search. The justification for the broad scope of the search, and the higher burden of proof, dissipates almost entirely in an empty holding cell. *Accord Gonzalez*, 728 F.3d at 159 ("[T]he suspect was placed in a vacant cell, decreasing the concerns regarding

16

jailhouse safety.") (citing *Weber*, 804 F.2d at 799); *Hartline*, 546 F.3d at 102 n.5 ("[T]his case presents a markedly different set of circumstances than those addressed by the 'special needs' standard applied to policies providing for routine strip searches in . . . institutions housing large, dangerous, or vulnerable populations where introduction of secreted contraband from the outside raises a substantial risk of harm.  No such special needs exist where . . . an arrestee is taken to an empty cell for purposes of an evidentiary search, subsequent booking, and release." (citations omitted)).  In the absence of the unique governmental interest in maintaining a jail, a reasonableness inquiry, rather than presumed deference to police officers, is the proper standard to apply.  The exception applied in *Bell, Turner,* and *Florence*, like all exceptions permitting suspicionless searches, should be "closely guarded" and confined to the circumstances necessitating deference to government officials.  *Chandler v. Miller*, 520 U.S. 305, 309 (1997)); *cf. N.G.*, 382 F.3d at 244 (Sotomayor, J., dissenting) ("[T]he question is not whether the government's concerns justify a potentially invasive search of some kind . . . in the absence of individualized suspicion.  Nor is the question whether the government's concerns justify a full strip search when there is some reasonable suspicion that a particular [person] possesses contraband.  The question instead is whether the government's concerns are sufficiently credible and sufficiently weighty to justify a highly degrading, intrusive strip search absent any individualized suspicion that the particular [persons] ordered by the state to disrobe possess contraband.").

The distinction drawn above is not merely academic.  Courts are ordinarily careful to distinguish between detention in police stations and jails—and each of the opinions in *Florence* explicitly drew that distinction.  The majority opinion clarified that the Court was not ruling "on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other

detainees." 132 S. Ct. at 1522.  Other opinions were emphatic on this point.  Justice Alito's

concurrence specified that "[t]he Court holds that jail administrators may require all arrestees

*who are committed to the general population of a jail* to undergo visual strip searches."  *Id.* at

1524 (Alito, J., concurring).  Chief Justice Roberts, too, noted that "the circumstances before [the

Court] . . . include the fact[] that there was apparently no alternative . . . to holding [Florence] in

the general population."  *Id.* at 1523 (Roberts, C.J., concurring).  And Justice Breyer's dissenting

opinion agreed that "[t]he case is limited to strip searches of those arrestees entering a jail's

general population."  *Id.* at 1525 (Breyer, J., dissenting).  In short, all nine justices explicitly

rejected the interpretation that the Defendants argue for here:  that the decision in *Florence*

applies to strip searches in a police station.  *Accord Ellsworth v. Wachtel*, 2013 WL 140342, *5

(N.D.N.Y. Jan. 11, 2013) ("The Majority in *Florence* (along with both Concurrences and the

Dissent) emphasized that this was a narrow holding and that the rule announced therein might

not apply to arrestees who were not going to be introduced to the general jail or prison

population. . . . Plaintiff [] was not searched prior to her introduction into a general jail

population, and therefore falls under the exception to the rule in *Florence*.").  *But see Ochei v.

Cnty. of N.Y.*, No. 10 Civ. 3718 (AKH), 2013 WL 553514, *3 (S.D.N.Y. Feb. 14, 2013)

(discussing stationhouse pat-down, during which an officer unzipped plaintiff's pants: "The

Supreme Court has approved of more invasive searches following an arrest." (citing *Florence*));

*Paulin v. Figlia*, 916 F. Supp. 2d 524, 532 (S.D.N.Y. 2013) (discussing stationhouse strip search:

"The [*Florence*] Court did not distinguish a search based on the type of facility in which it was

conducted . . . .").

　　　　There are other reasons that *Florence* does not permit the suspicionless visual body

cavity search at issue in this case.  It is does not appear that *Florence* applies to visual body

cavity searches at all.  The first paragraph of the opinion states that "[t]he specific measures

being challenged will be described in more detail," and later catalogues all the procedures to

which Florence was subject, the most extreme of which was "to lift his genitals, turn around, and

cough in a squatting position."  132 S. Ct. at 1513-14.  The Court later observed that the term

"strip search" is "imprecise," and explained that it may refer to many different practices,

including "directing detainees . . . to move or spread the buttocks or genital areas."  *Id.* at 1515.

But the Court's ultimate holding was limited, explicitly, to the searches performed on Florence.

*Id.* at 1523.  The opinion cannot be read, as Defendants urge, to authorize suspicionless visual

body cavity searches as a matter of law.  The line between a strip search and a body cavity search

is constitutionally relevant:  the scope of a search bears directly on its reasonableness.  *United

States v. Barnes*, 506 F.3d 58, 62 (1st Cir. 2007) (affirming holding that strip search was justified

but visual body cavity search was not); *People v. Hall*, 10 N.Y.3d 303, 311 (2008) ("To advance

to the next level required for a visual cavity inspection, the police must have a specific,

articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted

evidence inside a body cavity . . . ."); 3 LaFave § 5.3(c) ("[I]t is to be doubted that *Florence*

should be read as authorizing, as a matter of routine, the much more severe intrusion of a 'visual

body cavity search' into the anus or vagina.").  *But see Gonzalez*, 728 F.3d at 161 (describing

*Florence* as holding that "misdemeanor arrestees could be subject to visual body cavity searches

before being placed in the general prison population") (dictum).

   Second, a judge had not decided whether to commit Fate to the general population of a

jail.  A majority of the Justices in *Florence* expressed worry that, although it may be reasonable

to conduct suspicionless strip searches upon admission to the general population of a jail, it may

not be reasonable to send some arrestees to jail at all.  Justice Alito's concurrence explained:

> [T]he Court does not hold that it is *always* reasonable to conduct a
> full strip search of an arrestee whose detention has not been
> reviewed by a judicial officer and who could be held in available

facilities apart from the general population.  Most of those arrested
for minor offenses are not dangerous, and most are released from
custody prior to or at the time of their initial appearance before a
magistrate.  In some cases, the charges are dropped.  In others,
arrestees are released either on their own recognizance or on
minimal bail.  In the end, few are sentenced to incarceration.  For
these persons, admission to the general jail population, with the
concomitant humiliation of a strip search, may not be reasonable,
particularly if an alternative procedure is feasible. . . .

The Court does not address whether it is always reasonable,
without regard to the offense or the reason for detention, to strip
search an arrestee before the arrestee's detention has been
reviewed by a judicial officer.  The lead opinion explicitly reserves
judgment on that question.  In light of that limitation, I join the
opinion of the Court in full.

*Id.* at 1524-25 (Alito, J., concurring) (citations omitted).  Chief Justice Roberts's concurrence

was not as direct, but he also noted that Florence had been arrested pursuant to a warrant, and

there appeared to be no alternative to admitting him to the general population of a jail.  *Id.* at

1523 (Roberts, C.J., concurring).  He praised the "wisdom" of the majority's decision to allow

for the possibility of an exception to its holding under different circumstances, lest the Court

"embarrass the future."  *Id.* (citation omitted).  And Justice Breyer, joined by Justices Ginsberg,

Sotomayor, and Kagan, agreed that "it remains open for the Court to consider whether it would

be reasonable to admit an arrestee for a minor offense to the general jail population, and to

subject her to the 'humiliation of a strip search,' prior to any review by a judicial officer."  *Id.* at

1525 (Breyer, J., dissenting) (quoting Justice Alito's concurrence).  This caveat, supported by a

majority of the Justices, is a premise of the exception established by *Bell* and *Turner*[11]:  "if [a

person] is detained for a suspected violation of a federal law, he [] has had a bail hearing. Under

such circumstances, the Government concededly may detain him to ensure his presence at trial

---

[11] As discussed *supra* n.10, *Turner* concerned regulations imposed on convicted prisoners, who
had certainly enjoyed more procedural protections than a bail hearing.

and may subject him to the restrictions and conditions of the detention facility . . . ." *Bell*, 441 U.S. at 536.  An initial appearance before a judge seems to be important—if not essential—to the applicability of *Bell* and *Turner*.  At the very least, a majority of the Justices in *Florence* recognized that, if a jail strip searches every detainee admitted to the general population, the decision to send an arrestee to that jail is functionally a decision to strip search him.  Such a decision must be subject to a reasonableness inquiry if it is not made by a judge.

Finally, the search here was a discretionary one.  There is no evidence or suggestion that the policymakers at the Spring Valley police department had concluded, based on their expertise, that it was appropriate to conduct a visual body cavity search of every arrestee detained at the station.  This type of policy choice is the only choice contemplated by *Bell*, *Turner*, and *Florence*.  Those cases all rely heavily on the premise that "[t]he task of determining whether a policy is reasonably related to legitimate security interests is 'peculiarly within the province and professional expertise of corrections officials,'" and therefore, "courts should ordinarily defer to their expert judgment in such matters."  *Florence*, 132 S. Ct. at 1517 (citing *Block v. Rutherford*, 468 U.S. 576, 584-85 (1984); *Bell*, 441 U.S. at 548).  There was no such expert policy judgment here.  *Florence* further justified the policy at issue based on correctional officers' "essential interest in readily administrable rules."  132 S. Ct. at 1522 (quoting *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001)).  There is no rule to uphold here.  Instead, Defendants ask the Court to uphold an individual officer's authority to select unlucky arrestees to be strip searched, for no articulable reason, at the officer's absolute discretion.  But in the absence of individualized reasonable suspicion, the existence of a well-reasoned general policy is the only thing protecting an arrestee from an arbitrary (unreasonable) search of his person.  Defendants' reading of *Florence* would effectively circumvent the requirement that searches incident to a lawful arrest must be reasonable in "scope and manner of execution."  *King*, 133 S. Ct. at 1970

(citing *McArthur*, 531 U.S. at 331); *see* 3 LaFave § 5.3(c) (discussing discretionary searches of the body such as Breathalyzers or fingernail scrapings: "Quite obviously, none of these procedures can be characterized as 'routine,' . . . for these procedures are not employed as a matter of course upon all arrested persons. . . . [I]t is to be doubted that [these] procedures . . . would be upheld in a case where there is no rational basis for arguing that the objective was to find evidence of the crime for which the person was in custody."); *accord Ellsworth*, 2013 WL 140342 at *5 n.4 ("The Court also notes that—because the Second Circuit already recognizes a 'special needs' standard in the prison context—the *Florence* rule should leave untouched the Second Circuit's individualized suspicion requirement in the case of non-custodial searches."). Even if a stationhouse strip search were characterized as a species of special needs search—a characterization unsupported by any authority Defendants have cited here—the officer's decision to search would need to be justified either by individualized reasonable suspicion or by a reasonable general policy. Special needs searches must be reasonable. Reasonableness requires reasons. As the Supreme Court held in a leading special needs case:

> To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . ." *Terry*, 392 U.S. at 22. . . . When there is not . . . reasonable suspicion[,] . . . we cannot conceive of any legitimate basis upon which a patrolman could decide [to] stop[] a particular driver . . . . This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.

*Delaware v. Prouse*, 440 U.S. 648 (1979) (citing *Almeida-Sanchez v. United States*, 413 U.S. 266, 270 (1973); *Camara v. Municipal Court*, 387 U.S. 523, 532-533 (1967)). Regardless of whether stationhouse strip searches are incident to a lawful arrest or special needs searches, the

discretion of the officer conducting the search must be limited in some meaningful way.  Strip searches are an extraordinary invasion of privacy.  Courts must demand factual justification supporting either the officer's exercise of his discretion or the policy pursuant to which he acted.

In short, *Florence* does not apply to discretionary visual body cavity searches at a police station.  Such searches are still subject to the *Hartline* standard requiring individualized reasonable suspicion.

### c.    Application

Having concluded that *Florence* does not apply to the search at issue in this case, the Court must determine whether there is a genuine issue of material fact regarding the constitutionality of the visual body cavity search.  As discussed above, an officer must be able to justify the particular intrusion he makes—in other words, the fact that he chose to conduct a strip or visual/manual body cavity search—based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21; *see Hartline*, 546 F.3d at 100.  To avoid falling prey to any particular officer's unjustified hunches, courts assess reasonable suspicion using an objective standard: would the circumstances lead a person of reasonable caution to believe that it was appropriate to order a strip or body cavity search?  *See Terry*, 392 U.S. at 21-22; *Hartline*, 546 F.3d at 100-101.  In other words, "[d]o the circumstances of [the] arrest support a reasonable suspicion that [the arrestee] was secreting contraband on [his] person?"  *Hartline*, 546 F.3d at 101.

Considering the evidence in the light most favorable to Fate, the answer in this case is no. Fate was arrested while he was walking to a deli to buy breakfast on a Friday morning.  He had no reason to anticipate this arrest.  *Accord Florence*, 132 S. Ct. at 1531 (Breyer, J., dissenting) ("[T]hose arrested for minor offenses are often stopped and arrested unexpectedly.  And they consequently will have had little opportunity to hide things in their body cavities.").  The

arresting officers initially detained him for false personation and then arrested him pursuant to an outstanding warrant on a petit larceny charge.  They did not find any contraband on his person during his initial detention and arrest.  Nor did Fate have an opportunity to hide anything between his buttocks: Officer Korba was seated next to him in the backseat for the five-minute ride to the police station.  While there is some factual dispute about whether Fate attempted to put his hands in his pants, a jury would be entitled to believe Fate's testimony that he did not do so—or to conclude that Korba still lacked reasonable suspicion that Fate had inserted something into his anal cavity.  *Cf. Bell*, 441 U.S. at 578 (Marshall, J., dissenting) ("To insert an object into the vaginal or anal cavity, an inmate would have to remove [his] jumpsuit, at least from the upper torso.  [] Since contact visits . . . are continuously monitored by corrections officers, such a feat would seem extraordinarily difficult.  There was medical testimony, moreover, that inserting an object into the rectum is painful and 'would require time and opportunity which is not available in the visiting areas,' [] and that visual inspection would probably not detect an object once inserted.").  Moreover, as in *Hartline*, neither officer asked Fate whether he was concealing anything on his person.  In short, a jury could find that Defendants had no reason to suspect that Fate was secreting weapons, additional identification, or evidence of the alleged larceny on his person.  On this view of the evidence, not even a basic strip search was justified.  Fidgeting when sitting in the backseat of a police car with one's hands handcuffed behind the back does not "g[i]ve strong support for an inference that [an arrestee] was secreting [anything] on [his] person, much less in [his] person."  *Hartline*, 546 F.3d at 101.  The facts in this case are even more compelling than in *Hartline*, where the arresting officers had, in fact, discovered marijuana in the plaintiff's car before arresting her for a Class B misdemeanor.  *Id.* at 97-98, 101.  Despite that discovery, the Second Circuit held:

> Ultimately, if the facts of this case amount to reasonable suspicion, then strip searches will become commonplace. Given the uniquely intrusive nature of strip searches, as well as the multitude of less invasive investigative techniques available to officers confronted by misdemeanor offenders, that result would be unacceptable in any society that takes privacy and bodily integrity seriously.

*Id.* at 102.  That holding applies here with full force.  *Compare Kaufman v. Rivera*, 173 F.3d 844 (2d Cir. 1999) (upholding jury verdict denying liability for strip search where plaintiff acted in a "bizarre, irrational and belligerent" manner, commented that she was able to grab a gun on a nearby table, and returned to the courtroom twice against officers' orders and despite the judge's admonition that he would not issue a decision that day), *aff'g* No. 95 Civ. 5667 (JFK), 1998 WL 314744 (S.D.N.Y. June 12, 1998)).[12]  There is a genuine issue of material fact as to the possible violation of Fate's right to be free from unreasonable searches.[13]  Defendants' motion for summary judgment on this point is denied.

---

[12] Defendants also cite *United States v. Gaynor*, 262 Fed. App'x 341, 342 (2d Cir. 2008), as authority holding that fidgeting is sufficient to establish "reasonable suspicion."  But it is essential to consider *of what* there is reasonable suspicion.  A strip search requires reasonable suspicion that an arrestee is concealing contraband on his person; a visual body cavity search requires reasonable suspicion that an arrestee is concealing contraband inside that body cavity.  A *Terry* stop, however, requires only reasonable suspicion "that [the officer's] safety or that of others was in danger."  392 U.S. at 27.  Being fidgety and nervous, making suspicious statements, and reaching into one's jacket as if reaching for a weapon (as Gaynor did) may justify an officer's suspicion that he is in danger—but it is not at all clear that these facts justify an officer's suspicion that the suspect is concealing something in his anus.  It is certainly not clear that fidgeting alone justifies such a suspicion.  *Gaynor* does not support Defendants' argument.

[13] Alternatively, a jury would be entitled to find that, based on Charles's personal history with Fate, Korba and Charles conducted a visual body cavity search for the purpose of humiliating him.  *Florence* explicitly abstained from considering "instances of officers engaging in intentional humiliation and other abusive practices."  *Id.* at 1523.  Strip searches without a legitimate goal, such as searches meant to punish a detainee, remain unconstitutional.  *See Iqbal v. Hasty*, 490 F.3d 143, 172 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Covino v. Patrissi*, 967 F.2d 73, 80 (2d Cir. 1992).

2.        **Qualified Immunity**

"Qualified immunity protects government officials 'from liability for civil damages as a result of their performance of discretionary functions, and serves to protect [them] from the burdens of costly, but insubstantial, lawsuits.'" *Farid v. Ellen*, 593 F.3d 233, 244 (2d Cir. 2010) (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)). Defendants are entitled to qualified immunity if their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Summary judgment based upon qualified immunity is appropriate if, even on the plaintiff's version of the facts, the defendants did not violate clearly established law. *Timmins v. Toto*, 91 Fed. App'x 165, 166 (2d Cir. 2004) (citation omitted).

As discussed above, *Hartline* was the leading Second Circuit case discussing the standard governing strip searches in 2009. In addition to reiterating the reasonable suspicion standard, *Hartline* also held that this standard was clearly established as of 2003. 546 F.3d at 102.

For the same reasons that a jury would be entitled to find that the visual body cavity search was unreasonable, Defendants are not entitled to qualified immunity. Viewing the evidence in the light most favorable to Fate, a jury could conclude that there was only one justification for the visual body cavity search: Fate fidgeted while he was handcuffed in the backseat. In light of *Hartline*, no reasonable officer could conclude that a strip search was warranted on this basis alone. *See also United States v. Asbury*, 586 F.2d 973, 976-77 (2d Cir. 1978) (listing factors commonly used to determine whether a strip search is reasonable, including "excessive nervousness" and "unusual conduct," and observing that "[i]n most of the cases upholding the legality of a strip search, the courts have relied upon a combination of the foregoing factors rather than upon any of them standing alone"). In contrast, on Korba's version of events, Fate was subjected to a strip search because he appeared to be trying to put something

down the back of his pants, and was subjected to an increasingly more intrusive search because

he had drugs in his clothing and a piece of plastic was sticking out from between his buttocks.

Under these circumstances, Defendants may well be entitled to qualified immunity.  Because the

facts are material and genuinely disputed, summary judgment is not proper.

> ### D.        Claims Against Officer Parwanta

Finally, Defendants move for summary judgment as to all claims against Parwanta on the

basis that there is insufficient evidence that he was personally involved in the search or the

ensuing altercation.  A plaintiff asserting § 1983 claims must allege the personal involvement of

each defendant.  *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (citation omitted).  Fate's

sole allegation against Parwanta is that he "witnessed the events that occurred with respect to

Plaintiff at the Spring Valley Police Station on October 31, 2009."  (Am. Compl. ¶ 31.)  There is

sufficient evidence to support this allegation, and that Parwanta was physically involved in the

struggle.  Although Charles and Korba testified that they do not remember Parwanta being

present during their interactions with Fate (Korba Tr. 34:15-20; Charles Tr. 117:9-19), both of

their subject resistance forms indicate that Parwanta was a witness, and Charles's form states that

Parwanta "assisted."  (Parker Decl., Ex. 3.)  Parwanta similarly testified that the forms reflect

that he "assisted" in some capacity.  (Holtzer Decl., Ex. H 30:23-31:6.)  This is consistent with

Fate's testimony that there were three to four officers present, including one who apparently

matches Parwanta's description and restrained him while he was on the ground.[14]  (Fate Tr.

---

[14] The parties have not cited any evidence of Parwanta's physical appearance, but the Court
assumes, based upon Defendants' failure to contest this argument, that a reasonable jury could
conclude that Fate's description accurately describes Parwanta.

75:15-76:6.)  There is therefore a genuine issue of fact as to whether Parwanta was involved in the use of alleged excessive force, and summary judgment is not appropriate.[15]

## IV.   Conclusion

For the foregoing reasons, it is hereby ORDERED that Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Fate's malicious prosecution claims are dismissed; his claims for unreasonable search, illegal seizure of currency, and excessive force are not.

The Clerk of Court is directed to terminate the motion at docket number 72.

The parties are directed to confer and to submit letters by June 14, 2014 addressing proposals for the remaining phase of this case, including (1) proposed dates and estimated length of time for trial, and (2) any proposals for settlement discussions (*e.g.*, mediation, settlement conference before the Magistrate Judge).

SO ORDERED.

Dated: New York, New York
          June 5, 2014

J. PAUL OETKEN
United States District Judge

---

[15] Parwanta contends that the fact that he did not fill out a subject resistance form indicates that he did not "get physical" and suggests that his assistance was limited to "just being in the room." (Parwanta Tr. 32:4-33:17.)  But even if it were clear that Parwanta was merely present and did not physically assist the other officers, he could potentially still be liable for failing to prevent a violation of Fate's constitutional rights.  *See, e.g.*, *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used . . . . [provided there was] a realistic opportunity to intervene to prevent the harm from occurring.") (citations omitted).  Because Defendants have presented no evidence that Parwanta could not realistically have intervened, the issue constitutes a question of fact for the jury.  *Id.* (citation omitted).